Lynn **HELLEBUST**, John R. Craft, Kansas Natural Resource Council, and Common Cause of Kansas, Plaintiffs,

v.

Sam **BROWNBACK**, in his official capacity as Secretary of the Kansas State Board of Agriculture, and Jay Armstrong, Victor Krainbill, Alvin Epler, Altis Ferree, Thayne Larson, Ralph H. Rindt, F.E. Bliss, Lois Schlickau, Floyd O. Coen, Bob L. Moore, Anne Marie Worley, and Art Howell, in their official capacities as members of the Kansas Board of Agriculture, Defendants.

Civ. A. No. 92–2374–JWL.

United States District Court,
D. Kansas.

May 7, 1993.

ers which affect the lives of all Kansas but its membership is selected by a narrowly limited voting process, the cases which interpret the equal protection clause of the Fourteenth Amendment to the United States Constitution, as applied to voting rights, dictate that the plaintiffs' motion for summary judgment (Doc. # 55) brought pursuant to 42 U.S.C. § 1983 seeking to declare this system unconstitutional and seeking a permanent injunction be granted. The defendants' motion to dismiss, or in the alternative, for summary judgment (Doc. # 59) is granted in part and denied in part for the reasons set forth below. The preliminary injunction entered on January 13, 1993 restraining the members of the board of agriculture from further conducting elections is hereby continued until final remedies are ordered in this case, 812 F.Supp. 1136. A hearing will be held by this court on June 30, 1993 to determine appropriate remedies required in the event that the Kansas Legislature does not otherwise rectify matters in the interim.[1]

## II. *Facts*

■ The court starts from the premise that policy choices of the duly elected representatives of the people of Kansas should not lightly be put aside and, indeed, are entitled to almost presumptive deference. It is only when the uncontroverted facts clearly establish that such a statutory scheme is one which the Constitution forbids that those legislative policy choices must give way in a court challenge.

The Kansas State Board of Agriculture began as the Kansas Agricultural Society in 1857 and was reestablished and renamed the Kansas State Board of Agriculture by the state legislature in 1872. Stene, *Kansas State Board of Agriculture*, Government Research Series No. 5, p. 12, University of Kansas (1948). At that time, the Board "was in effect nothing more than an officially recognized private organization. It was given no governmental authority and no duties were imposed upon it save that of preparing

Donn J. Everett, Everett, Seaton, Miller & Bell, Manhattan, KS, William J. Craven, Lecompton, KS, for plaintiffs.

David D. Plinsky, Office of Atty. Gen., Topeka, KS, for defendants.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

I. *Introduction*

Because the Kansas State Board of Agriculture exercises general governmental pow-

---

1. This memorandum and order constitutes the full opinion which was referenced in this court's memorandum and order of April 26, 1993, 824 F.Supp. 1506.

annual reports." *Id.* The main purpose of the Board at that time was to promote the immigration and education of farmers in the improvement of agricultural techniques. Over the years, the legislature has added more and more regulatory duties to the Board until it has responsibility for the broad-based regulatory functions which are present today.

In 1917, the state legislature created the pattern for election of the Board and the Secretary which continues today. Under this pattern, private agricultural associations select delegates who attend the annual meeting; these delegates elect the Board, who in turn appoints the Secretary. Although this electoral pattern has been expanded to include participation by many agricultural groups which did not participate in 1917, the basic method of election remains the same.

Because there is no case to which the court was cited or which its own research has uncovered that shares the particular salient characteristics of this one, it is especially important to examine here the facts which appear to be critical in light of the law as developed by the Supreme Court of the United States. The court takes judicial notice of these facts which are set out in the Kansas Statutes Annotated, and, as such, are not disputed.

Delegates from various agricultural organizations throughout the state are sent to the Kansas State Board of Agriculture's annual meeting. K.S.A. § 74–502 (1992). The organizations which send delegates include county agricultural societies, each state fair, each county farmer's institute, each livestock association having a statewide character, and each of the following with at least 100 members: county farm bureau associations, county granges, county national farmer's organizations, and agricultural trade associations having a statewide character. K.S.A. § 74–502(a) (1992). In addition, if 100 residents of a single county who are not members of any of the groups just listed sign a petition, they may send a delegate to the annual meeting. K.S.A. § 74–502(b) (1992).

These delegates elect the twelve members of the Board at those annual meetings, although, generally, a minority of the board members are elected each year. K.S.A. § 74–503 (1992). The members of the board, in turn, elect the Secretary of the Board of Agriculture. *Id.* This system of election is not intended to give all Kansans an equal vote in selecting the members of the Board of Agriculture.

The current Secretary is Sam Brownback, and the members of the Board are Jay Armstrong, Victor Krainbill, Alvin Epler, Altis Ferree, Thayne Larson, Ralph H. Rindt, F.E. Bliss, Lois Schlickau, Floyd O. Coen, Bob L. Moore, Anne Marie Worley, and Art Howell. The Secretary and the Board members are all defendants in this lawsuit.

The plaintiffs in this suit, which was filed late last year, are Lynn Hellebust and John Craft, residents of Kansas and the Kansas Natural Resource Council and Common Cause of Kansas. On January 13th of this year, the scheduled date of the Board's annual election, this court granted the plaintiffs' request for a preliminary injunction which barred the Board from holding any elections until this matter could permanently be determined. On April 26th, the court granted the plaintiffs' motion for summary judgment by a preliminary order. This final order now supplements that preliminary order.

The Kansas State Board of Agriculture is not simply an agricultural promotion or marketing agency or an entity which deals with matters disproportionately affecting those who elect it. The Board has broad regulatory powers which affect all residents of Kansas daily.

For example, the legislature has assigned the Board a significant role in regulation of the healthfulness of milk and meat sold in grocery stores. All the milk sold in this state must pass inspection by the State Dairy Commissioner, K.S.A. § 65–701(a)(1) (1992), who is appointed by the Kansas State Board of Agriculture. K.S.A. § 75–1401 (1989). If anyone tries to sell a resident of Kansas any mislabelled, unclean, or adulterated dairy product, it is the State Dairy Commissioner's duty to find that product and seize it. K.S.A. § 65–701(a)(2, 3) (1992). The Dairy Commissioner has the authority to enter any business premises, including the neighborhood

grocery store, during regular hours and conduct an inspection of dairy products on the premises. K.S.A. § 65–702 (1992). The Commissioner may also issue subpoenas for the appearance of witnesses and production of documents in order to carry out his or her duties. *Id.*

No one can buy any meat which is produced in Kansas unless it is first inspected by the Board of Agriculture. K.S.A. § 65–6a27(b)(2) (1992). The Board sets all the procedures and standards for inspection such as sanitation. K.S.A. § 65–6a31 (1992). The Secretary is responsible to conduct those inspections to make sure that meat produced in Kansas is healthy and fit to eat. K.S.A. § 65–6a20 (1992).

In another context, the Board fills a general regulatory role with regard to weights and measures, and not just those used in agriculture. Any commercial pump or scale used in Kansas, such as the ones used to fill cars with gasoline at the local filling station is subject to inspection by the Board of Agriculture. K.S.A. § 83–206 (Supp.1992). The Secretary or his agents have the right to enter any premises or vehicle to inspect any commercial measuring devices they may contain. K.S.A. § 83–208 (1989). If anyone interferes with an agent of the Board of Agriculture who wishes to enter a premises to inspect a scale or pump, that person may be charged with a Class A Misdemeanor. *Id.*

The Secretary of the Board of Agriculture regulates the application of pesticides in this state. K.S.A. § 2–2439 (1991). Anyone who applies pesticides commercially in Kansas, whether that person applies them to farm fields or suburban lawns, is subject to his regulation. K.S.A. § 2–2438a(n & m) (1991). If the Secretary determines that the application of a particular pesticide "poses a serious threat to the public health, safety, and welfare or the natural resources of the state," he may severely restrict the use of that pesticide. K.S.A. § 2–2478 (1991). The Secretary may also decide whether or not certain pesticides are highly toxic to humans and thus may be subjected to restrictions on their sale and application. K.S.A. § 2–2205 (1991).

Finally, the Board has significant power over the use and control of water in Kansas.

The Chief Engineer of the Division of Water Resources of the Kansas State Board of Agriculture controls who may take water out of rivers, waterways and aquifers throughout the state. K.S.A. § 82a–706 (1989). His control of water does not merely apply to farmers or agricultural uses but also reaches water rights held by cities, utilities and individuals not connected with agriculture. K.S.A. § 82a–702 (1989); K.S.A. § 82a–701(e, f & g) (1989). If he decides that too much water is being used, he can require water users to institute conservation measures. K.S.A. § 82a–733 (Supp.1992). If too much water is being taken out of a particular river or waterway, he can stop anyone from taking water out of it altogether. K.S.A. § 82a–703a (1989).

He also controls any attempt to divert water from Kansas to another state. K.S.A. § 82a–726 (1989). When someone applies for a permit to divert water from Kansas, the legislature requires that the Chief Engineer add

> such terms, conditions, and limitations that the chief engineer shall deem necessary *for the protection of public interest,* including an express condition that should any such water be *necessary to protect the public health and safety of the citizens of this state,* such approved application may be suspended, modified or revoked by the chief engineer for such necessity.

*Id.* (emphasis added).

The Chief Engineer also regulates the building of dams in this state. K.S.A. § 82a–301 (1989). All dams and water obstructions throughout the state (except those administered by the federal government) must meet the Chief Engineer's standards whether or not they are related to agriculture. K.S.A. § 82a–303b (1989). He may enter onto any private property to inspect dams and water obstructions to make sure they comply with his engineering and safety standards. K.S.A. § 82a–303b (1989).

These examples of the Board's regulatory functions, although significant for the determination of this case, are not exhaustive of the powers of the Board to regulate for the benefit of the health, safety, and welfare of

the general public. Suffice it to say, the Board exercises basic, general governmental powers.

### III. *The Law*

#### A. Equal Protection

■ For thirty years the equal protection clause of the Fourteenth Amendment has consistently been interpreted by the United States Supreme Court to require "one person, one vote" when electing officials of public entities with general governmental functions. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 379–80, 83 S.Ct. 801, 808–09, 9 L.Ed.2d 821 (1963).[2]

In *Reynolds v. Sims*, the Supreme Court first applied the constitutional requirement of "one person, one vote" to state government. 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). This requirement of "one person, one vote" means that one person's vote cannot be worth less or more than another's and someone who should be able to vote should not be prohibited from voting in a state government election. *See Gray*, 372 U.S. at 379, 83 S.Ct. at 808. Any attempts to dilute the value of votes or prohibit eligible voters from voting are subject to strict judicial scrutiny which few hybrid electoral systems are likely to satisfy. *Reynolds*, 377 U.S. at 561–62, 84 S.Ct. at 1381–82.

In *Reynolds*, the Court held that the state elections of Alabama were unconstitutional because of gross inequalities in voting power due to the failure of the state legislature to reapportion the state from 1900 to 1960. *Id.* at 567, 84 S.Ct. at 1384. In discussing the state's failure to reapportion, the Court observed that, "[r]epresentative schemes once fair and equitable become archaic and outdated." *Id.*

The Supreme Court applied this rule of "one person, one vote" to a number of governmental entities following the *Reynolds* case. In the course of applying the *Reynolds* doctrine, the Court theorized that an exception to that doctrine might exist under the following circumstances:

> Were the [governmental entity] a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents, we would have to confront the question whether such a body may be apportioned in ways which give greater influence to the citizens most affected by the organization's functions.

*Avery v. Midland County*, 390 U.S. 474, 483–84, 88 S.Ct. 1114, 1120, 20 L.Ed.2d 45 (1968).

The Supreme Court finally applied this narrow exception to this general rule of "one person, one vote" in the two leading cases of *Salyer Land Co. v. Tulare Lake Basin Water Storage District*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973) and *Ball v. James*, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981). In those cases, the court held that the general rule of "one person, one vote" does not apply when the government entity meets two requirements: (1) a special limited purpose and (2) the activities of the unit of government have a disproportionate effect on those who may vote for its officials. This narrow exception does not apply to the Kansas State Board of Agriculture because it neither has a special limited purpose nor does its activities disproportionately affect those who elect its officials.

In *Salyer*, the residents and certain landowners in a small California water storage district challenged on equal protection

---

**2.** In that case the Court stated, "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, *whatever their occupation*, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of "we the people" under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications. The idea that every voter is equal to every other

voter in his State, when he casts his ballot in favor of one of several competing candidates, underlies many of our decisions." *Gray*, 372 U.S. at 379–80, 83 S.Ct. at 808–09 (emphasis added). Justices Douglas and Stewart first coined the phrase "one person, one vote" in their concurrence to the majority opinion in *Gray* where they stated, "The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote." *Id.* at 381, 83 S.Ct. at 809.

grounds the method by which the board of directors of that water district were elected. *Salyer,* 410 U.S. at 724–25, 93 S.Ct. at 1227–28. Only landowners within the district were permitted to vote for the members of the board and votes in those elections were apportioned according to the assessed value of each landowner's land. *Id.* at 725, 93 S.Ct. at 1228. The Court concluded that the water district did not need to conform to "one person, one vote" because "of its special limited purpose and of the disproportionate effect of its activities on landowners as a group." *Id.* at 728, 93 S.Ct. at 1229.

The Court found that the water district only had the limited purpose of providing for the acquisition, storage, and distribution of water for farming in the Tulare Lake Basin. *Id.* at 728, 93 S.Ct. at 1229. In finding that the activities of the district disproportionately affected its voters, i.e. the landowners, the Court focused on who bore the burdens of the district's activities. "All of the costs of district projects are assessed against land by assessors in proportion to the benefits received," and any delinquent payments become a lien on the land. *Id.* at 729, 93 S.Ct. at 1230. "[T]here is no way that the *economic burdens* of district operations can fall on residents qua residents, and the operations of the districts primarily affect the land within their boundaries." *Id.* (emphasis added).

In *Ball,* the Court reviewed the method by which another water storage district was elected. The Salt River District under scrutiny in *Ball* was significantly larger and performed more functions than the Tulare Lake Basin District in *Salyer. Ball,* 451 U.S. at 367–68, 101 S.Ct. at 1819–20. However, the Salt River District board of directors was not unconstitutionally elected merely because it controlled a much larger entity that the Tulare Lake Basin District. "The constitutionally relevant fact is that all water delivered by the Salt River District, like the water delivered by the Tulare Lake Basin District, is distributed according to land ownership, and the District does not and cannot control the use to which the landowners who are entitled to the water choose to put it." *Id.* at 367–68, 101 S.Ct. at 1819. Again, the Supreme Court found that the Salt River Dis-

trict exercised only special limited governmental powers and the burdens of its activities disproportionately fell on the landowners who elected the members of its board.

The Kansas State Board of Agriculture is not like the water districts in *Salyer* and *Ball* in which the requirement of "one person, one vote" does not apply. First of all, the Board has a general rather than specialized governmental purpose. The Board has suggested that its only purpose is to provide a common forum to conduct marketing activities and disseminate information on agricultural topics. If that were the case, the Board would have a very limited purpose and the *Salyer* and *Ball* exception to "one person, one vote" would probably apply. But as has been described, the Board's actual broad regulatory powers, many or all of which the Board may not have sought or even desired, are at odds with the Board's narrow description of itself.

As was described earlier, the Board has broad regulatory powers which protect the health, safety, and welfare of the residents of Kansas. It is responsible for insuring the safety and fitness of the meat we eat and the milk we drink. It makes sure that dams which hold back the state's waters are sturdy enough to control our waters and prevent floods. It tests our gas pumps and grocery scales to make sure that consumers are not being cheated and it decides whether the pesticides which go on farm fields and suburban lawns alike should be applied and how they should be applied.

The powers that the Board of Agriculture apply in protecting our health, safety and welfare are commonly called police powers. Exercise of these police powers have traditionally been core government functions of the state. *See Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756, 105 S.Ct. 2380, 2397, 85 L.Ed.2d 728 (1985). Neither of the water districts in *Ball* or *Salyer* exercised police powers. In *Ball,* the Court found that these water districts only had a "nominal public character." *Ball,* 451 U.S. at 368, 101 S.Ct. at 1819. The Court stated that the districts were not subject to the "one person, one vote" requirements of *Reynolds* because they did not "administer such normal functions of government as the mainte-

nance of streets, the operation of schools, or sanitation, health, or welfare services." *Id.* at 366, 101 S.Ct. at 1818. In stark contrast, the Kansas State Board of Agriculture does "administer such normal functions of government" when it regulates to protect the health, safety, and welfare of residents of Kansas.

On first glance it may appear that the Chief Engineer of the Division of Water Resources of the Kansas State Board of Agriculture's regulatory control over dams in this state is similar to the flood control activities exercised by the Tulare Lake Basin District in *Salyer.* In that case, the plaintiffs argued that the district engaged in flood control activities which affected all residents of the water district, not just landowners. *Salyer,* 410 U.S. at 728 n. 8, 93 S.Ct. at 1230 n. 8. However, the Court found that because the district merely had the power to contract with the state of California or with the United States for the purpose of flood control and any such contract must be "for a purpose appurtenant to or beneficial to the project of the district," any flood control activities were merely "incident to the exercise of the district's primary functions of water storage and distribution." *Id.* In other words, the district's flood control activities were only authorized to protect the water storage and distribution functions of the district and were not intended to protect the health, safety, and welfare of the residents of the district.

The Chief Engineer's activities related to dams are not nearly so limited. As described above, he is responsible for setting engineering and safety standards for dams, issuing construction permits for them, and inspecting them once they are built. His regulatory oversight of dams is not limited to protected certain unspecified agricultural interests but rather protects the health, safety, and welfare of all residents of Kansas. Hypothetically, if the Tulare Lake Basin District had built dams in order to control flooding, those dams would have been permitted and inspected by California's equivalent of Kansas' Chief Engineer. The reason the District would have built these dams would

have been to protect its water storage and distribution activities. The very different reason that this hypothetical equivalent of the Chief Engineer would inspect them would be to protect the interests of the public. When the Chief Engineer inspects a dam, he is exercising one of the "normal functions of government."

The Board's regulatory control of water in the state is of particular concern. As described above, the Chief Engineer may institute conservation measures if too much water is being used in a particular area or may restrict diversions from a particular watercourse if it falls below a certain minimum streamflow. The Chief Engineer may also restrict the diversion of Kansas waters into other states. The Supreme Court said in *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources,* — U.S. ——, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992), "a state's power to regulate the use of water in times and places of shortage for the purpose of protecting the health of its citizens . . . is at the core of its police power." This is just another example of the Board exercising general governmental police powers which disqualify it for the special exception found in *Salyer* and *Ball.*

The defendants' argument that the Kansas State Board of Agriculture does not have general governmental powers because it lacks the power to tax and is funded by appropriations from the state legislature is unpersuasive. The issue is not whether a governmental unit has the power to collect its own funds but whether it exercises general governmental powers. For example, in *Fumarolo v. Chicago Board of Education,* 142 Ill.2d 54, 153 Ill.Dec. 177, 566 N.E.2d 1283 (1990), the Supreme Court of Illinois determined that special local school councils in Chicago exercised general governmental powers and were subject to the requirements of *Reynolds* even though they lacked the power to "*levy taxes,* appropriate money, enter into contracts, issue bonds, or acquire property." *Id.* 566 N.E.2d at 1296 (emphasis added).[3] An additional example of a govern-

---

**3.** The court held that the local school councils exercised general governmental powers even though they lacked the above powers enumerat-

mental entity which was judged to have general governmental powers even though it lacked the power to levy taxes is found in *Board of Estimate of City of New York v. Morris*, 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989). Therefore, the absence of the power to tax by no means equals the absence of general governmental powers.

The activities of the Kansas State Board of Agriculture, moreover, do not disproportionately affect those who elect it. In *Ball* and *Salyer*, the Supreme Court focused on who bore the burdens of the governmental units. In both cases, the landowners who elected the board members of those districts were the only ones subject to the districts' power to tax and condemn land. The Kansas State Board of Agriculture differs from *Ball* and *Salyer* in this respect in two ways. First, the burdens of the Board do not disproportionately fall on those participating in agriculture. As described earlier, the Board's regulatory activities affect and protect all residents of the state of Kansas. The second way that the Board does not disproportionately affect those who vote for it is that not all farmers participate in the electoral process. Only representatives of certain agricultural organizations and individuals who comply with a complicated procedure which involves obtaining a petition with the signatures of one hundred farmers who are not affiliated with an agricultural organization may send delegates to the annual meeting to elect board members. K.S.A. §§ 74–502, 74–503 (1992). This system for deciding who may vote in the Board's annual meeting does not appear designed to correlate voting power to the governmental entity's even arguably disproportionate effect in the way that occurred in *Salyer* and *Ball* by tying voting to the land which was taxed to support the districts' operations or which received their benefits.

Although the Kansas State Board of Agriculture is not similar to the water districts in *Ball* and *Salyer*, it is similar to two specialized governmental entities which were found to violate the *Reynolds* "one person, one vote" principle. The Kansas State Board of Agriculture is obviously not a "general government" in Kansas like the state government or a county or city government. The Board is a specialized governmental entity which exercises certain general governmental functions which affect all Kansans. Two Supreme Court cases have found that two other specialized governmental entities violated the "one person, one vote" principle.

In *Kramer v. Union Free School District*, the Court declared a statute unconstitutional which provided an unusual method to elect members of the school board. 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). In that case, those who could vote for school board members were limited to otherwise qualified district residents who were either (1) the owners or lessees of taxable real property located within the district, (2) spouses of persons owning qualifying property, or (3) parents or guardians of children enrolled for a specified time during the preceding year in a local district school. *Id.* at 623, 89 S.Ct. at 1887. The court held that these classifications did not promote a compelling state interest, and therefore failed to survive close scrutiny, because the method of election excluded many parents who had distinct and direct interests in school meeting decisions and included many persons who had, at best, remote and indirect interests in the school board. *Id.* at 632–633, 89 S.Ct. at 1892–93.

In *Hadley v. Junior College District*, the Supreme Court rejected a method of election for six trustees who conducted the affairs of a junior college district which included Kansas City. 397 U.S. 50, 51–52, 90 S.Ct. 791,

ed in some of the Supreme Court cases for the following reasons:

The local school councils are the cornerstone, in a real sense, of the operation of the city's schools and they play a significant role in the Act's scheme to improve education in the City of Chicago. They have important and multiple powers that affect the whole community. The administration of education through the operation of our schools is a fundamental governmental activity in which all members of society have an interest. Furthermore, educational activities are financed by and affect virtually every resident. The local school councils perform an indispensable role in administering the board's educational policy at the local level and in carrying out the legislature's intent to create a dominant force at that level.

*Id.* 566 N.E.2d at 1298.

792, 25 L.Ed.2d 45 (1970). Missouri law, at the time, provided that these trustees were to be apportioned among separate school districts on the basis of the number of persons within each district between the ages of six and twenty years old. *Id.* at 51, 90 S.Ct. at 791–92. The Court held that the election of the trustees was required to meet the "one person, one vote" principle because "the trustees perform important governmental functions within the district, and we think that these powers are general enough and have sufficient impact throughout the district to justify that the principle [of 'one person, one vote'] be applied here." *Id.* at 53–54, 90 S.Ct. at 794. The Court held that the junior college district which performed the traditionally "vital government function" of education should be elected by "a popular election in compliance with *Reynolds.*" *Id.* at 56, 90 S.Ct. at 795. The Court specifically decided that an exception to this principle when officials are elected whose "duties are so far removed from normal governmental activities and so disproportionately effect [sic] different groups" was clearly not applicable. *Id.*

Just as in *Hadley,* where the trustees performed a traditionally vital governmental function, the members of the Board of Agriculture perform the traditional and equally vital governmental function of regulation for the protection of the health, safety, and welfare of the public. The junior college district in *Hadley* was not a "general government", in the sense that it was the city, county, or state government, but it did perform general governmental functions. Likewise, the Kansas State Board of Agriculture is not the state government in Kansas but it does perform important general governmental functions within the borders of this state. Thus, the Court's analysis in *Hadley* supports the outcome of this case, i.e. the Board must comply with *Reynolds.*

The defendants have argued that the case of *Holt Civic Club v. Tuscaloosa,* 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978) supports their position that the rule of "one person, one vote" does not apply. However, that case is not applicable because it dealt solely with the extraterritorial effects of municipal governments. There the plaintiffs challenged the fact that the city of Tuscaloosa, Alabama was given powers to regulate certain activities outside but in close proximity to its corporate limits although the plaintiffs, who could be affected thereby, could not vote for Tuscaloosa's governing body. The Court based its decision that *Reynolds* was not invoked on the fact that the plaintiffs did not live within the geographical boundaries of the municipality, even if the governing body of that municipality still had some influence on them. The Court would only apply *Reynolds* to voting which occurs within some defined geography. In the case at hand, all parties are located within the geographical borders of Kansas and only the activities of the Board within the state are at issue.

At oral argument, the defendants also argued that the Third Circuit decided that a governmental entity which, like the Board, performed regulatory functions was within the *Ball* and *Salyer* exception in *Benner v. Oswald,* 592 F.2d 174 (3d Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979). However, in that case the board of trustees of Pennsylvania State University were actually found not to perform any general governmental functions. *Id.* at 183. "At most, the board has the authority to approve a budget and set a level of tuition. And even in the setting of tuition, they do not have a free hand." *Id.* The court does not agree that the trustees in *Benner* performed regulatory functions similar to those performed by the Board as was suggested by the defendants at oral argument.

*Reynolds* requires that if the "one person, one vote" principle applies, any deviation from that principle is subject to strict scrutiny. *See Kramer,* 395 U.S. at 626, 89 S.Ct. at 1889; *Reynolds,* 377 U.S. at 561–62, 84 S.Ct. at 1381–82. However, if the *Ball* and *Salyer* exception applies, the electoral system need only meet a rational basis test. *See Salyer,* 410 U.S. at 730, 93 S.Ct. at 1230. Even if the *Reynolds* voting principle does not apply to the Kansas State Board of Agriculture because it fit within the *Ball* and *Salyer* exception, the Board's electoral system would fail to meet a rational basis test. The method of selection for voting delegates to the Board's annual meeting represents "a crazy quilt" of

agricultural organizations and interests. The present system is underinclusive because it fails to include all those whom the Board argues that it disproportionately affects, i.e. farmers, and is overinclusive because non-farmers who happen to belong to agricultural organizations, such as agricultural equipment and supply dealers who are not actually farmers themselves, may also participate in the election of Board members. *See generally, Kramer*, 395 U.S. at 632, 89 S.Ct. at 1892 (The Supreme Court found that a system of enfranchisement which included persons with only remote and indirect interests in school affairs and excluded others with distinct and direct interests in school meeting decisions failed to promote the state's articulated goal of restricting a voice in school board elections to those who were directly affected by such decisions.) In addition, the present system allows an individual who is a member of several organizations to have several opportunities to participate in the Board's election.

However, because the *Ball* and *Salyer* exception does not apply, the Kansas State Board of Agriculture is subject to the general rule of *Reynolds v. Sims*. In *Reynolds*, the Court stated

> Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.

Id. 377 U.S. at 561–62, 84 S.Ct. at 1381. The Board is also subject to the following guidelines given by the Supreme Court in *Hadley:*

> We therefore hold today that as a general rule, whenever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election,

and when members of an elected body are chosen from separate districts, each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials.

*Hadley,* 397 U.S. at 56, 90 S.Ct. at 795.

Therefore, unless the defendants can show a compelling state interest for its present system of election, if the members of the Kansas State Board of Agriculture are elected, all voters in Kansas must have an equal opportunity to determine who will be the members of the Board and the Secretary. The defendants have failed to show a rational basis, much less, a compelling state interest for the method of selection of the Kansas State Board of Agriculture.

## B.  Standing

The court recognizes as a threshold matter that these plaintiffs must have standing in order to bring this lawsuit. Mr. Hellebust and Mr. Craft are residents of Kansas who do not belong to any of the enfranchised farm organizations.[4] At least these two plaintiffs do have standing to bring this suit because their claims meet the three requirements for standing as set out by the Supreme Court in *Lujan v. Defenders of Wildlife,* —— U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992): injury in fact, causation, and redressability. They claim to have been injured in fact by the Board and the Secretary who administered an unconstitutional election and were unconstitutionally elected themselves. The plaintiffs claim that the defendants in this action caused their injury by acting in a governmental capacity over them even though they were not constitutionally selected. Finally, the plaintiffs contend there is a substantial likelihood that this court may redress their injury by declaratory judgment and injunction. This court agrees.

In voting cases where the plaintiffs claim to be directly injured by the government's

---

4.  The defendants initially challenged Mr. Hellebust's and Mr. Craft's basis for standing because discovery which asked whether either of these gentlemen belonged to an agricultural organization which elected the Board had not yet been

answered. At oral argument, plaintiffs' counsel stated that neither Mr. Hellebust nor Mr. Craft belongs to any such organization. The defendants did not controvert that statement and it is accepted for these purposes.

action, standing is normally not a significant issue because "there is ordinarily little question that the [government's] action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it." *Lujan,* — U.S. at —, 112 S.Ct. at 2137. Moreover, the Supreme Court has given broad standing to those who challenge obstacles to their right to vote. *See Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).[5]

The defendants argue that Common Cause of Kansas has no standing to sue because it is not a corporation and therefore has no legal status in Kansas. While this factual issue is controverted, it is not material because so long as the individual plaintiffs have standing, those plaintiffs may maintain this suit.

### C. Miscellaneous

The court has considered the other arguments which the plaintiffs and defendants have made in their pleadings. These arguments are addressed here briefly because they are not determinative of any of the matters before the court.

#### 1. Kansas State Legislature not a Necessary Party

■ The Kansas state legislature is not a necessary party to this action. The defendants argue that because the plaintiffs' alleged injury is their loss of the right to vote, only the legislature can give them that right to vote. However, because the plaintiffs' actual injury results from (1) the board administering an unconstitutional election, and (2) their being governed by an unconstitutionally elected body, there is no need for the legislature to be a party in order to gain relief. This court may fashion remedies which redress those injuries.

#### 2. Plaintiffs' Ability to Join Enfranchised Organizations

The plaintiffs' ability to join one of the organizations which elect delegates who in turn elect Board members does not nullify their claim of injury. Even if one of the plaintiffs joined one the enfranchised organizations, that plaintiff's right to vote may still be unconstitutionally diluted. In addition, the state cannot impose a condition or penalty on the exercise of a constitutional right such as the right to vote that contravenes any constitutional provision or congressional restriction enacted pursuant to constitutional power. *Harman v. Forssenius,* 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965).[6] "[C]onstitutional rights would be of little value if they could be ... indirectly denied," *Smith v. Allwright,* 321 U.S. 649, 664, 64 S.Ct. 757, 765, 88 L.Ed. 987 (1944), or "manipulated out of existence." *Gomillion v. Lightfoot,* 364 U.S. 339, 345, 81 S.Ct. 125, 129, 5 L.Ed.2d 110 (1960).

#### 3. Defer Judicial Action until the Legislature Acts

The defendants' argument that this court should defer action until legislative action is taken is unpersuasive. They maintain that several bills are pending in the legislature which would change the election process for the Board. For case authority, the defendants cite *Growe v. Emison,* — U.S. —, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) in which the Supreme Court "has required federal judges to defer consideration of disputes involving redistricting where the State, through its legislative or judicial branch, has begun to address that highly political task itself."

However, *Growe* is distinguishable from the present case because there a state court challenge was ongoing at the time the federal case was brought. The state court had deferred acting on the reapportionment action

---

**5.** In that case, the Court stated, "We also agree that appellee, like any person whose right to vote is impaired, has standing to sue." *Gray v. Sanders,* 372 U.S. 368, 375, 83 S.Ct. 801, 805, 9 L.Ed.2d 821 (1963) (citations omitted).

**6.** "True, '(t)he States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised.' The right to vote, however, is constitutionally protected, and the conditions imposed by the States upon that right must not contravene any constitutional provision or congressional restriction enacted pursuant to constitutional power." *Id.* 380 U.S. at 536, 85 S.Ct. at 1183 (citations omitted).

because it had already determined that the state's legislature would act in a timely fashion. The Supreme Court held that the state court action should be completed before the federal courts interceded. In *Growe*, the state court's action was underway and likely to be timely and effective.

In addition, *Growe* only expressly applies in the context of reapportionment. *Growe* cites *Scott v. Germano*, 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965), in which a district court was reversed for acting on a state reapportionment after the state supreme court had ruled that the current apportionment was invalid "but expressed confidence that the General Assembly would enact a lawful plan during its then current session, scheduled to end in July 1965." —— U.S. at ——, 113 S.Ct. at 1080. The defendants have not presented any affidavits or documents which suggest that such confidence should exist in this case.

Unlike *Growe*, none of the bills referenced by the defendants have even had a hearing. This court has no basis to conclude that they will be acted upon in a timely fashion. If it were otherwise, the court would gladly defer. However, this court will not delay acting upon the issues in this suit in the absence of any indication that the legislature intends to address the problem.[7]

### 4. The Board Members as Legislative Appointees

The defendants argue that the current Board members are constitutionally present in office because after this court's preliminary injunction barred the last election, the members of the Board were effectively appointed by the legislature. Neither party contests that a legislature can appoint officials. See *Hadley v. Junior College District*, 397 U.S. 50, 58, 90 S.Ct. 791, 796, 25 L.Ed.2d 45 (1970); *Leek v. Theis*, 217 Kan. 784, 797, 802, 539 P.2d 304 (1975). The defendants argue that the current members of the Board are appointed by the legislature under K.S.A. § 74–503 (1992) which states: "At the expiration of the terms of these members, succeed-

ing members shall be elected from their designated districts for terms of three years, *or until their successors are elected and qualified.*" (emphasis added). The defendants argue that this statute legislatively appointed the current members of the board when their elective terms had expired but this court's order restrained new elections in January. Therefore, the defendants argue, even if those members were unconstitutionally elected originally, by enjoining the election, the court caused those members to be constitutionally appointed by the legislature. This court disagrees.

The preliminary injunction against holding an unconstitutional election did not convert the Board members who were unconstitutionally present into legislative appointees who could constitutionally remain in office. The members of the Board were only present because they were unconstitutionally elected in the first place. The plaintiffs were injured by their initial unconstitutional election and continue to be injured by their remaining in office by order of this court after their terms have expired.

### 5. The Secretary as Appointed by the Board

■ The defendants argue that the Secretary of the Board constitutionally holds his position because he was appointed by the Board, even if they are unconstitutionally elected. The court disagrees. The defendants cite *Sailors v. Kent Board of Education*, 387 U.S. 105, 108, 87 S.Ct. 1549, 1552, 18 L.Ed.2d 650 (1967) in support of their position. In *Sailors*, the county school board members were appointed by local school boards which were each constitutionally constituted. The Court merely upheld the right of local governments to appoint officers rather than require that each be popularly elected. The Court held "the choice of members of the ... board did not involve an election and since none was required for these nonlegislative offices, the principle of 'one man, one vote' has no relevancy." *Id.* at 111, 87 S.Ct. at 1553. The Court also held that there

---

7. The court purposely delayed the issuance of this full opinion until after the legislature adjourned sine die on May 2, 1993 in vain hope that it might act. It has, moreover, deferred addressing remedies until an even later date in the apparently unlikely event that further developments might occur.

is "no constitutional reason why state ... officers of the nonlegislative character ... may not be chosen by the legislature, or by some other appointive means rather than by election." Id. at 108, 87 S.Ct. at 1552. This case differs from *Sailors* because here the Secretary is appointed by an unconstitutionally elected Board.

##### 5. The Secretary as a De Facto Official

The defendants argue that the Secretary is a de facto official and may therefore constitutionally remain in office. However, even if the Secretary is a de facto official, this does not make the system used to appoint him to office constitutional. The doctrine of de facto officers relates only to the legitimacy of the actions of officials, not the constitutionality of their presence in office. *See State v. Latham & York*, 190 Kan. 411, 426, 375 P.2d 788 (1962), *cert. denied*, 373 U.S. 919, 83 S.Ct. 1310, 10 L.Ed.2d 418 (1963) ("the fact that a legislature has not reapportioned in accordance with the state constitution does not preclude it from making any law or doing any act within the legislative competence.... Any other conclusion would result in the destruction of state government."); *Ryan v. Tinsley*, 316 F.2d 430, 432 (10th Cir.), *cert. denied*, 375 U.S. 17, 84 S.Ct. 139, 11 L.Ed.2d 46 (1963) (The court rejected a prisoner's appeal that he was convicted pursuant to a statute passed by a malapportioned legislature.). The doctrine of de facto official is not even arguably applicable here because the plaintiffs are not challenging the lawfulness of any action by the Board.

##### 6. Experimental State Structure

The defendants argue that the Board is an experimental government structure which is constitutionally valid. The Supreme Court has stated that states have the need for flexibility and experimentation when structuring agencies of government. *See Dusch v. Davis*, 387 U.S. 112, 117, 87 S.Ct. 1554, 1556, 18 L.Ed.2d 656 (1967); *Sailors v. Board of Education*, 387 U.S. at 110–11, 87 S.Ct. at 1553; *Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). However, local governments are still subject to the one person, one vote requirement un-less they have limited functions such as discussed in *Ball* and *Salyer*.

#### IV. *The Defendants' Motion to Dismiss or for Summary Judgment*

For the reasons set already set forth, the defendants' motion to dismiss, or in the alternative, for summary judgment on the plaintiffs' 42 U.S.C. § 1983 claims for declaratory and injunctive relief from the unconstitutionally elected Kansas State Board of Agriculture is denied.

The Defendants' motion to dismiss the plaintiffs' claims that the method of election violates the Kansas state constitution is granted because this court lacks jurisdiction to determine whether the Board's method of election violates state law. "Section 1983 does not ... provide a basis for redressing violations of *state* law, but only for those violations of *federal* law done under color of state law." *Jones v. City and County of Denver, Colo.*, 854 F.2d 1206, 1209 (10th Cir. 1988); *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). Therefore, the defendants' motion to dismiss the plaintiffs' 1983 claim for violation of state law is granted.

#### V. *Order*

For the reasons stated above,

**IT IS THEREFORE ORDERED BY THE COURT** that the plaintiffs' motion for summary judgment on their Fourteenth Amendment Claim (Doc. # 55) is granted.

**IT IS FURTHER ORDERED BY THE COURT** the defendants' motion to dismiss, or in the alternative, for summary judgment (Doc. # 59) is granted in part and denied in part.

**IT IS FURTHER ORDERED BY THE COURT** that the defendants' motion to dismiss, or in the alternative, for summary judgment is denied with respect to the plaintiffs' Fourteenth Amendment claim.

**IT IS FURTHER ORDERED BY THE COURT** that the defendants' motion to dismiss the plaintiffs' claim that the method of election for the Kansas State Board of Agriculture violates the Kansas State Constitution is granted.

**1524**

IT IS FURTHER ORDERED BY THE COURT that Kansas Statutes Annotated §§ 74–502 & 503 (1992) setting forth the method to elect members and the Secretary of the Kansas State Board of Agriculture as that body is constituted and empowered are hereby declared to violate the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States of America.

IT IS FURTHER ORDERED BY THE COURT that the preliminary injunction issued by this court on January 13, 1993 enjoining the defendants, their officers, agents, servants, employees and attorneys and all other persons in active concert and participation with the defendants from conducting the elections required by Kansas Statutes Annotated § 74–503 shall continue until this court shall issue a final opinion on the issue of appropriate remedies.

IT IS FURTHER ORDERED BY THE COURT that a hearing on the issue of appropriate remedies in this matter will be held on June 30, 1993 at 2:00 p.m.

IT IS FURTHER ORDERED BY THE COURT that the plaintiffs may submit a brief on the issue of remedies by May 28, 1993. The defendants may then respond to the plaintiffs' brief by June 21, 1993. The defendants may reply by June 28, 1993. Service shall be made on counsel for the opposing parties by fax or hand delivery and not by mail. In addition to filings made with the clerk, two copies of each of these briefs shall be delivered directly to the court.