Lynn HELLEBUST, John R. Craft, Kansas Natural Resource Council, and Common Cause of Kansas, Plaintiffs–Counter–Defendants/Appellees,

v.

Sam BROWNBACK, in his official capacity as Secretary of the Kansas State Board of Agriculture; Jay Armstrong; Victor Krainbill; Alvin Epler; Altis Ferree; Thayne Larson; Ralph H. Rindt; F.E. Bliss; Lois Schlickau; Floyd O. Coen; Bob L. Moore; Anne Marie Worley; Art Howell, in their capacities as members of the Kansas Board of Agriculture, Defendants–Counter–Claimants/Appellants.

Nos. 93–3164, 93–3238.

United States Court of Appeals, Tenth Circuit.

Dec. 19, 1994.

William J. Craven (Donn J. Everett of Everett, Seaton, Miller, and Bell, Manhattan, KS, with him on the briefs), Lecompton, KS, for plaintiffs-counter-defendants/appellees.

David D. Plinsky, Asst. Atty. Gen. (Robert T. Stephan, Atty. Gen., with him on the briefs), Topeka, KS, for defendants-counter-claimants/appellants.

Before MOORE, LAY,* and MCWILLIAMS, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

This appeal involves the constitutionality of the procedure of electing members to the Kansas State Board of Agriculture (Board). Challenged here is the district court's order declaring the current statutory method violates the Equal Protection Clause of the Fourteenth Amendment and enjoining the Board from conducting further elections until the Kansas State Legislature enacts a scheme consistent with the principles set out in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). *Hellebust v. Brownback,* 824 F.Supp. 1511 (D.Kan.1993) (*Hellebust I*). Finding no error in the district court's analysis of the constitutional violation or its choice of a remedy, we affirm.

## I. Background

Because the district court's order fleshes out the facts and history of this case, *id. at 1512–14,* we shall simply note its skeletal frame for our review. By statute, Kan.Stat. Ann. §§ 74–502 and 74–503, delegates from Kansas agricultural organizations[1] attend the Board's annual meeting where they elect either all twelve Board members, or fewer, depending upon when terms expire. Board members then elect their Secretary. Plaintiffs charged this method violates the principle of one person, one vote because the Board, a state governmental agency, exercises broad authority affecting arguably all Kansans and is not limited solely to agriculture or agribusiness interests.

In their effort to persuade the district court otherwise, defendants, Sam Brownback, Secretary of the Board, and its twelve members contended not only that the election process is constitutional; but, also, in the absence of the legislature as a necessary party, the court should defer to that body to remedy the present system. Rejecting both arguments, the district court subsequently declared the terms of the present Board and Secretary expired and appointed the Governor of the State of Kansas receiver for the Board. *Hellebust v. Brownback,* 824 F.Supp. 1524, 1527 (D.Kan.1993) (*Hellebust II*).

Central to its legal conclusion and remedy was the district court's factual finding the Board's reach far extends the fields of agriculture and agribusiness. While the Board insisted the approximately eighty laws which the legislature has entrusted it to enforce are confined to the narrow purposes of the state's agricultural industries, the court found, for example, anyone who pumps gas in Kansas relies on a facility subject to the Board's inspection. "Any commercial pump or scale used in Kansas, such as the ones

---

* The Honorable Donald P. Lay, Senior Circuit Judge for the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. The district court enumerated the state organizations sending delegates:
   county agricultural societies, each state fair, each county farmer's institute, each livestock association having a statewide character, and each of the following with at least 100 members: county farm bureau associations, county

granges, county national farmer's organizations, and agricultural trade associations having a statewide character. Kan.Stat.Ann. § 74–502(a) (1992). In addition, if 100 residents of a single county who are not members of any of the groups just listed sign a petition, they may send a delegate to the annual meeting. Kan.Stat.Ann. § 74–502(b) (1992).
*Hellebust v. Brownback,* 824 F.Supp. 1511, 1513 (D.Kan.1993).

used to fill cars with gasoline at the local filling station, is subject to inspection by the Board of Agriculture. Kan.Stat.Ann. § 83–206 (Supp.1992)." *Hellebust I* at 1514. All meat and dairy inspection is entrusted to the Board whose appointee, the State Dairy Commissioner, has the authority to enter any business premises, conduct inspections, issue subpoenas, and otherwise enforce state regulations on safe dairy and meat products. The Secretary regulates the use of pesticides whether applied to residential lawns or farmlands. The Board's Chief Engineer of the Division of Water Resources controls not only farm and agricultural water uses but also "water rights held by cities, utilities and individuals not connected with agriculture." *Id.*

With its approximately 330 employees and a budget of about $15 million allocated from the general fund, the district court found the Board "is not simply an agricultural promotion or marketing agency or an entity which deals with matters disproportionately affecting those who elect it. The Board has broad regulatory powers which affect all residents of Kansas daily." *Id.* at 1513.

The Board challenges these findings and the conclusions of law they propagate, arguing: (1) the district court should have permitted the Kansas legislature to remedy the voting procedures;[2] (2) the legislature is an indispensable party; (3) the Secretary and Board members have been constitutionally appointed by operation of law; (4) the Board cannot independently exercise legislative powers; and (5) the voting procedures are subject only to rational review to uphold their constitutionality. That is, the Board maintains the voting procedure here is preserved by the explicit reservation for "a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents." *Avery v. Midland County, Tex.*, 390 U.S. 474, 483–84, 88 S.Ct. 1114, 1119–20, 20 L.Ed.2d 45 (1968). The Court articulated this exception in *Salyer Land Co. v. Tulare Lake Basin Water Stor. Dist.*, 410 U.S. 719,

93 S.Ct. 1224, 35 L.Ed.2d 659 (1973), and *Ball v. James*, 451 U.S. 355, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981); and the Board urges we apply it here.

## II. One Person, one vote

■ Our review must begin with the principle announced in *Reynolds* and recited in its progeny that "in an election of general interest, restrictions on the franchise other than residence, age, and citizenship must promote a compelling state interest in order to survive constitutional attack." *Hill v. Stone*, 421 U.S. 289, 295, 95 S.Ct. 1637, 1642, 44 L.Ed.2d 172 (1975) (citing *Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969)). The breadth of this mandate does not tolerate constitutional distinctions on the basis of the purpose of the election or the function—legislative or administrative—of the elected official. *Hadley v. Junior College Dist.*, 397 U.S. 50, 54–56, 90 S.Ct. 791, 794–95, 25 L.Ed.2d 45 (1970). In the line of cases stemming from *Reynolds*, "[t]he consistent theme ... is that the right to vote in an election is protected by the United States Constitution against dilution or debasement." *Id.* 397 U.S. at 54, 90 S.Ct. at 794.

The Court has fashioned a narrow exception to this rule. In *Ball*, 451 U.S. at 355, 101 S.Ct. at 1812–13, and *Salyer Land Co.*, 410 U.S. at 719, 93 S.Ct. at 1225, the Court held the one person, one vote rule does not apply to units of government having a narrow and limited focus which disproportionately affects the few who are entitled to vote. In *Salyer*, the Court reasoned the defendant water district had relatively limited authority because it provided only for the acquisition, storage, and distribution of water for farming in a localized basin. The Court specifically noted the water district offered "no other general public services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body." 410 U.S. at 728–29, 93 S.Ct. at 1229–30. Nor did it exercise "what might be thought of as 'normal governmen-

---

**2.** Three different measures were evidently introduced during the 1993–1994 legislative session. During oral argument on September 28, 1994,

counsel for the Board advised us no action had been taken as of that time on any of those measures.

tal' authority, but its actions disproportionately affect landowners" in the Tulare Lake Basin. *Id.* at 729, 93 S.Ct. at 1230.

In *Ball*, the water district provided additional services, "more diverse and affect[ing] far more people," 451 U.S. at 365, 101 S.Ct. at 1818, generating electricity and selling it to Phoenix and other cities to meet most of the district's revenue needs. These added services, however, did not create distinctions which "amount to a constitutional difference." *Id.* at 366, 101 S.Ct. at 1818. The Court summarized:

> [T]he District simply does not exercise the sort of governmental powers that invoke the strict demands of *Reynolds*. The District cannot impose ad valorem property taxes or sales taxes. It cannot enact any laws *governing the conduct of citizens, nor does it administer such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services.*

*Id.* (emphasis added). Thus, while an entity's "nominal public character," *id.* at 368, 101 S.Ct. at 1819, may shield it from the demands of the Fourteenth Amendment and permit a rational relationship analysis, once the line is crossed into the governmental powers arena, one person, one vote applies.

With these distinctions in mind, we turn to the findings of the district court. After reviewing the numerous state laws providing the Board with its supervisory and enforcement authority, the district court stated:

> These examples of the Board's regulatory functions, although significant for the determination of this case, are not exhaustive of the powers of the Board to regulate for the benefit of the health, safety, and welfare of the general public. Suffice it to say, the Board exercises basic, general governmental powers.

*Hellebust I* at 1514–15. That conclusion embraced each of the Board's powers, which the district court discussed, ranging, as noted, from regulating the healthfulness of milk and meat sold in the state to generally regulating all weights and measures, including those commercially used by entities outside the agricultural industry. The court pointed out the Board has "significant" control over the use of water, not only by farmers and ranchers, but also by cities, utilities, and individual non-agricultural users. *Id.* at 1514. The Chief Engineer of the Division of Water Resources within the Board also controls interstate water diversions. Concomitantly, agents of the Board have enforcement authority to carry out its orders and regulations which extend beyond the agricultural industry.

The Board argues from a listing of the laws subject to its authority, "[i]t is obvious ... every one of them is related to agricultural products, the marketing of agricultural products, the protection of agricultural consumers, statistical and scientific studies related to agriculture, and administrative matters facilitating the serving of agricultural needs of Kansas." Even accepting that statement as accurate, it begs the issue here. Our focus is not whether some of the Board's activities deal exclusively with agriculture, but whether its powers transcend that ground and materially affect residents of Kansas who are not represented by the present method of Board selection.

Thus, that some of the Board's oversight is only of nominal public character does not abridge the range of its general powers. Indeed, asked where to draw the line when specialized purposes and general powers coincide, the Board was unable to direct us to any authority permitting the specialized to override the general once general powers are found or providing a balance for the two. Instead, it suggested the test should be that those primarily interested in the election should vote. Because all qualified voters in Kansas meet that definition given the breadth of oversight exercised, the district court correctly permitted those who are regulated and taxed to reflect their interest in the Board's membership.

Moreover, the constitutional significance of these facts cannot be obscured by the Board's gloss that its powers are limited because it is subject to legislative and executive controls in other areas. The Board's partial dependence on the actions of other state entities does not restrict the range of governmental powers it wields. Indeed, in a

traditional system in which one branch of government is subject to the checks and balances of another, such dependence is the norm. Consequently, the incidental effect other entities have on the Board does not minimize its authority nor vitiate the requirement for selection reform.[3]

Once a state agency has the authority to affect every resident in matters arising in their daily lives, its powers are not disproportionate to those who vote for its officials. The quality of meat and dairy products consumed by everyone in the state; the accuracy of the scales upon which people are charged for consumer goods; the right to divert and use water; the use of pesticides on residential lawns, city parks, and farmlands are not services disproportionate to those who attend the annual meeting of the Board. Those matters unremittingly influence every person within the State of Kansas. Moreover, as correctly determined by the district court, those matters fall within the state's police powers and comprise part of the normal functions of state government. Thus, although the Board exercises powers that uniquely benefit the agricultural industry, its core governmental powers deprive the Board of the umbra of *Ball* and *Salyer.*

### III. Presence of the Kansas State Legislature

██  The Board reasserts the district court erred in failing to hold the state legislature is a necessary party without whom the court cannot order complete relief. Fed.R.Civ.P. 19(a). The Board maintains the legislature is "the only entity capable of providing such relief." However, the district court held there was no need to join the legislature as a party because "plaintiffs' actual injury results from (1) the board administering an unconstitutional election, and (2) their being governed by an unconstitutionally elected body." *Hellebust I* at 1521. Moreover, the

district court found the presence of the legislature was unnecessary for the relief requested.

Reviewing this matter de novo, *Dickinson v. Indiana State Election Bd.,* 933 F.2d 497, 500 (7th Cir.1991), we find no error in the district court's reasoning. In this case, plaintiffs sought to declare their Fourteenth Amendment rights were being violated and to enjoin that violation. The Board is the source of that violation, and prohibiting its unconstitutional exercise of power remedies that grievance. Further, in granting relief, the district court has left the door open for the state legislature to submit a remedy and to intervene under its continuing supervision of this action.[4] In *Dickinson,* a case under Section 2 of the Voting Rights Act, the court held the legislature, while not a necessary party, could, if it desired, intervene, and observed its interests were already represented. *Id.* at 500. We believe the same analysis applies here.

### IV. Remedy

██  Despite the Board's representations from the onset of this lawsuit through oral argument that bills have been introduced to the Kansas State Legislature to alter the selection process, none has yet been acted upon. Nevertheless, the Board continues to urge, in the absence of legislative action, the district court abused its discretion in imposing a remedy rather than deferring to the legislature.

However sensitive we are to the important role of the state legislature in remedying an unconstitutional procedure of its own making, and however reluctant we are to utilize judicial tools in a legislative process, we fully recognize "[i]t is enough to say now that, once a State's ... [election] scheme has been found to be unconstitutional, it would be *the unusual case* in which a court would be justified in not taking appropriate action to

---

3.  Similarly, the Board's contention at oral argument that the district court's enjoining further elections triggered a legislative holdover provision, making each holdover Board member a de facto appointee by the legislature, hardly validates the present procedure.

4.  As noted, the legislature may intervene at any time. Moreover, "sovereign immunity does not protect governmental entities from action for equitable or extraordinary relief." *State ex. rel. Stephan v. Kansas House of Representatives,* 236 Kan. 45, 687 P.2d 622, 627 (1984) (action in mandamus brought on relation of attorney general to determine constitutionality of statute).

insure that no further elections are conducted under the invalid plan." *Reynolds,* 377 U.S. at 585, 84 S.Ct. at 1393 (emphasis added). Aside from the Board's assurances, it indicates nothing to us to make this the "unusual case" in which we should leave the constitutional violation in place.

The contour for a remedy in any equitable case is set by "the nature of the violation." *Milliken v. Bradley,* 418 U.S. 717, 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069 (1974) (quoting *Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971)). Thus, "[r]emedial techniques ... will probably often differ with the circumstances of the challenged ... [practice] and a variety of local conditions." *Reynolds,* 377 U.S. at 585, 84 S.Ct. at 1393. The district court recognized these parameters and sought to tailor its relief to the unique circumstances of this case.

Consequently, in fashioning the remedy, the district court observed the Governor of Kansas would be the logical and most effective official to oversee the agency, bringing the executive authority of the governor's office to the Board's helm. Rejecting more intrusive remedies like "blocking appropriations to the KSBA, stripping away general governmental authority from the defendants, convening a special session of the Kansas Legislature," *Hellebust II* at 1526, the district court instead declared the terms of members of the Board to be expired and appointed the governor receiver for the Board.

We believe the district court thoughtfully crafted this relief to cure the violation without unnecessarily overstepping the circumstances of this case. The district court did not infringe the state legislature's authority by dictating a new election procedure for the selection of the Board, but left to legislative prerogative the method of changing the process.[5] Nevertheless, we suggest the district court establish a deadline by which the legislature must act, to prod the legislature to address these orders and to provide the district court an outer limit for its supervision.

We, therefore, hold the district court did not abuse its discretion in remedying the established violation of the Fourteenth Amendment. The judgment is **AFFIRMED,** and the case is **REMANDED** so the district court may retain jurisdiction until a constitutionally acceptable selection process is enacted.

---

**5.** Nothing in this opinion suggests the members must be selected by election. We merely hold if the election process is chosen, the right to vote must be extended to all qualified voters throughout the State of Kansas.