**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ROBERT DOOL; JULIE BROWN;
DONALD D. ROSENOW; THOMAS C.
SCHERMULY,

       Plaintiffs – Appellants,

v.

ANNE E. BURKE, in her official capacity
as Chairman of the Kansas Supreme Court
Nominating Commission; KERRY E.
MCQUEEN, in his official capacity as
Attorney Member of the Kansas Supreme
Nominating Commission; PATRICIA E.
RILEY, in her official capacity as Attorney
Member of the Kansas Supreme
Nominating Commission; MATTHEW D.
KEENAN, in his official capacity as
Attorney Member of the Kansas Supreme
Nominating Commission; JAY F.
FOWLER, in his official capacity as
Attorney Member of the Kansas Supreme
Nominating Commission; CAROL
GILLIAM GREEN, in her official capacity
as Clerk of the Kansas Supreme Court,

       Defendants – Appellees.

No. 10-3320
(D.C. No. 6:10-CV-01286-MLB-KMH)
(D. Kan.)

**ORDER AND JUDGMENT**<sup>\*</sup>

---

    \* This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.

    It is appropriate as it relates to law of the case, issue preclusion and claim
preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir.
R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate

Before **O'BRIEN**, **McKAY**, and **MATHESON**, Circuit Judges.

A group of Kansas voters, none of them lawyers, sued the attorney members of the Supreme Court Nominating Commission (Commission) and the Clerk of the Appellate Courts requesting a temporary restraining order and preliminary injunction to prevent any vacancies from being filled while this lawsuit is pending. The Commission is composed of five attorneys elected by attorneys and four non-attorneys appointed by the Governor. Appellant voters claim the selection of the Commission's attorney members violates the one person, one vote principle of the Equal Protection Clause because the franchise is closed to all but attorneys. The district court denied the preliminary requests for relief before going on to dismiss the complaint for failure to state a claim. The voters appealed from the dismissal.

AFFIRMED.

**Entered for the Court**

**Per Curiam**

parenthetical notation – (unpublished). *Id*.

10-3320, *Dool, et al. v. Burke, et al.*

**O'BRIEN**, J. concurring.

Kansas fills appellate court vacancies using a merit-selection system under which the governor picks from a shortlist of candidates tendered by a nomination commission. The commission is comprised of five attorneys and four non-attorneys. Non-attorney members are appointed to the commission by the governor, while attorney members are elected by resident attorneys. The effect of the system is to give Kansas lawyers disproportionate influence over the selection process.

This case presents an equal protection challenge to the election of the commission's attorney members. The challengers, non-attorney residents of Kansas, claim they must be given an equal opportunity to participate in elections for the Commission's attorney members, much as they would in elections for any other public offices. In their view, denying otherwise qualified voters the right to vote on equal terms with resident lawyers violates the Equal Protection Clause of the Fourteenth Amendment. For the reasons stated herein, I concur in the Order and Judgment entered Per Curiam.

### BACKGROUND

Kansas is not alone in its use of merit selection to fill judicial vacancies. The system is employed in one form or another by more than thirty states. Sandra Day O'Connor, *The Essentials and Expendables of the Missouri Plan*, 74 MO. L. REV. 479, 486 (2009). What sets apart merit selection in Kansas is its genesis. Before 1958, Kansas voters chose judges by popular election, with the governor filling interim

vacancies by appointment. Jeffrey D. Jackson, *The Selection of Judges in Kansas: A Comparison of Systems*, 69-JAN J. KAN. B. Ass'n, Jan. 2000, at 33.

Confidence in that system hit bottom in 1956 when Governor Fred Hall, defeated in his party's primary election, set his sights on the state supreme court, specifically the seat of chief justice, which was soon to be vacated by the ailing Bill Smith, a loyal supporter of Hall's. *See id.* at 34. Resolved to have the seat but unable to appoint himself, Hall (in cooperation with Smith) did the next best thing: he waited for Chief Justice Smith to resign and ceded the governorship to his lieutenant, John McCuish, on the condition that McCuish appoint him to fill the judicial vacancy. *Id.* McCuish did just that, his first and final decision in his 11-day tenure as governor. Their three-step maneuver—Smith resigns from the bench, Hall resigns the governorship, McCuish appoints Hall to take Justice Smith's seat—would be remembered, disgracefully, as the Kansas triple play.

The public was outraged. Within days a joint resolution had been introduced in the legislature calling for an overhaul of the judicial-selection process and the creation of a non-partisan judicial nomination commission. *See Anatomy of a Merit Selection Victory*, 93 JUDICATURE 6, 8 (2009) (remarks of panelist Greg Musil). Less than two years later, in the 1958 general election, Kansas voters resoundingly approved a constitutional amendment establishing the Supreme Court Nomination Commission ("Commission"). KAN. CONST. ART. 3, § 5. Legislation implementing the amendment followed in short order, KAN. STAT. ANN. § 20-119 *et seq*., and two decades later, when the legislature created the Kansas Court of Appeals, it charged the Commission with

selecting nominees to fill vacancies on that court and certain trial courts[1] as well, KAN.

STAT. ANN. § 20-3004(a).

The Commission is a nine-member body consisting of a chairperson (a lawyer

licensed and residing in Kansas), as well as one attorney member and one non-attorney

member from each of the four U.S. congressional districts. KAN. STAT. ANN. § 20-119,

20-120. The attorney members are elected by licensed attorneys residing in their

respective congressional districts, the chairperson by Kansas attorneys voting at large.

*Id.* The four non-attorney members are appointed by the governor. KAN. CONST. ART. 3,

§ 5. The attorney-member selection process is administered by the Clerk of the Appellate

Courts. KAN. STAT. ANN. §§ 20-119, 20-120. When a seat opens on the Supreme Court

or the Court of Appeals, the clerk alerts the Commission's chairperson and sends a notice

of vacancy, along with a deadline for submission of applications, to eligible Kansas

attorneys residing in the state. KAN. STAT. ANN. §§ 20-132, 20-3007; Patricia E. Riley,

*Merit Selection: The Workings of the Kansas Supreme Court Nominating Commission*, 17

KAN. J. L. & PUB. POL'Y 429, 431 (2008). Once applications are submitted, candidates

undergo interviews and background checks, and the Commission, which may act only by

majority vote, decides which three names will be submitted to the governor. Riley,

*supra*, at 432-34. The governor must select one of the three candidates to fill the

---

[1] In 1974 the legislature enabled voters in each judicial district to opt into the merit selection system for selecting trial judges and magistrates. KAN. STAT. ANN. §§ 20-2901-16. To date 17 districts (embracing 52 counties) use the merit selection system. Stacie L. Sanders, *Kissing Babies, Shaking Hands, and Campaign Contributions: Is this the Proper Role for the Kansas Judiciary?*, 34 Washburn L. J. 573, 580 n. 49 (1995). The remaining 14 districts (53 counties) still select district judges by partisan election. *Id.*

vacancy. KAN. CONST. ART. III, § 5(a), (e); Riley, *supra*, at 432-34. Should the governor fail to appoint one of the three candidates within 60 days of receiving the list, the duty falls to the the chief justice of the Kansas Supreme Court. KAN. CONST. ART. III, § 5(b).

Merit selection notwithstanding, Kansas voters retain control over the tenure of the members of the state judiciary. Supreme Court justices and Court of Appeals judges stand for retention in the general election after serving for at least a year. *Id*. § 5(c). The same goes for trial court judges in the 17 districts that have adopted merit selection for district judges and magistrates.[2] Appointed judges can keep their office if a majority of those voting elect to retain them, or else the office becomes vacant and the process starts over. *Id*. Kansas Supreme Court justices stand for retention every six years, appellate-court judges and district judges every four. KAN. STAT. ANN. §§ 20-3006(b), 20-2902.

National experience demonstrates no timidity by voters in ending the tenure of judges standing for retention. Although incumbents regularly prevail in retention elections, victory is hardly automatic. In 2010 alone, the list of failed retention candidates included (but was not necessarily limited to) three Supreme Court justices in Iowa, two district judges in Colorado, a district court judge in Alaska, and a magistrate in New Mexico. *Judicial Selection in the States*, American Judicature Society, http://www.judicialselection.us/.[3]

---

[2] The Kansas Judicial Report Card, http://www.kansasjudicialperformance.org/index.cfm?? Page=TheKansasJudicialReportCard (last visited July 30, 2012). One hundred twenty-nine of the state's 244 trial court judges are chosen by merit selection. *Id*.

[3] Wyoming's experience is, perhaps, emblematic. Its merit selection system is

## DISCUSSION

## A.

That citizens have a fundamental right to vote for public officials on equal terms with one another is uncontroversial. *Reynolds v. Sims*, 377 U.S. 533, 562 (1964); *Wesberry v. Sanders*, 376 U.S. 1, 7 (1964). That the right is comprehensive, extending beyond statewide legislative bodies to county and municipal offices, and even to smaller entities such as school boards and college trustees, is similarly beyond dispute. *See, e.g.*, *Hadley v. Junior Coll. Dist.*, 397 U.S. 50, 53-54 (1970); *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 626-27 (1969); *Avery v. Midland Cnty. Tex.*, 390 U.S. 474, 476-77, 484-85 (1968). The question presented by this appeal is whether it extends even further, beyond traditional democratic institutions to specialized bodies like the Commission, and if so, whether the process for electing the Commission's attorney members violates the Equal Protection Clause of the Fourteenth Amendment.

The foundational voting rights decision is *Reynolds*, the first in a series of electoral apportionment cases to announce the principle that one person's vote should count for no more or no less than another's. 377 U.S. at 562. *Reynolds* concerns state legislatures, and the immediate effect of the decision was to require state legislative districts to be

---

quite similar to the Kansas system. *See* WYO. CONT. ART. 5, § 4. Since Wyoming adopted merit selection in 1972, voters have ousted five judges in retention elections, four general-jurisdiction trial judges and one Supreme Court justice. *Judicial Selection in the States: Wyoming*, American Judicature Society, http://www.judicialselection.us/ judicial_selection/index.cfm?state=WY. Wyoming had five Supreme Court justices and 16 district court (general jurisdiction) judges in 1972. Wyoming Blue Book, Vol. III 29-30 (Virginia Trenholm ed., Wyoming State Archives and Historical Dept, 2007). As of July 2012, the number of district judges had risen to 23. WYO. STAT. ANN. § 5-3-102. The number of Supreme Court Justices has remained the same.

nearly equal in population. *See Branch v. Smith*, 538 U.S. 254, 268 (2003). But while

*Reynolds* requires due regard for equal protection in legislative elections, it does not

address whether qualified voters are entitled to participate on equal terms in elections for

non-legislative offices. *See Avery*, 390 U.S. at 484.

The Court answered that question in *Avery*, concluding *Reynolds* applies with

equal force to officials of a county government who exercise "general governmental

powers over the entire geographic area served by the body." 390 U.S. at 485. Central to

the Court's holding was the idea that citizens should have a voice in the selection of the

public officials charged with ensuring their well-being. The Court observed that "the

States universally leave much policy and decision making to their governmental

subdivisions," *id*. at 481, and that there is no difference, for equal protection purposes,

"between the exercise of state powers through legislatures and its exercise by elected

officials in the cities, towns, and counties." *Id*.

Political participation is a recurring theme in the post-*Reynolds* voting rights cases,

with the Court extending one person, one vote to minor elective offices because equal

participation is required whenever a public official has the power to affect the day-to-day

affairs of the electorate. In *Hadley*, for instance, the Court applied one person, one vote

to elections for trustees of a junior-college district. *Hadley*, 397 U.S. at 53-54. As in

*Avery*, the inquiry hinged on whether the elected trustees performed "general

governmental functions," with a focus on the scope of the official power and its impact

on the electorate:

We feel that these powers, while not fully as broad as those of the [county

commissioners in *Avery*], certainly show that the trustees perform important governmental functions within the districts, and we think these powers are general enough and have sufficient impact throughout the district to justify the conclusion that the principle which we applied in *Avery* should also be applied here. *Id.*

Even the Court's decision in *Kramer*, perhaps the most sweeping interpretation of *Reynolds* to date, is grounded by the principle that voters should be given an equal opportunity to participate in elections affecting their daily lives. 395 U.S. at 626. *Kramer* involved a challenge to a system for school district elections; it limited voting eligibility to local parents and those who owned or leased property in the district. *Id.* at 623. In extending *Reynolds* to school board elections, the Court considered strict scrutiny to be appropriate when "a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others. . . ." *Id.* at 627. This broad language is at the heart of the challengers' assertion that *Reynolds* applies to all state and local elections, without regard to the powers of the office. But as with *Avery* before it and *Hadley* after, the Court's decision in *Kramer* frames the right to vote in terms of its relationship to participatory democracy. The Court described the franchise as bound up with the "legitimacy of representative government," *id.* at 626, and explained that "[s]tatutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives." *Id.* at 627. The Court did not say what force, if any, *Reynolds* has in elections for governmental offices which do not affect the daily lives of the electorate.

- 7 -

The Supreme Court has carved out an exception to *Reynolds* for limited-purpose bodies exercising narrow government functions and operating to the burden or benefit of one group of constituents more than others. *Ball v. James*, 451 U.S. 355, 371 (1981); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 729 (1973). The exception is seldom applied, and to date the only special-purpose bodies to have benefited from the Supreme Court's relaxed scrutiny are water and power districts in which the administration is financially independent of local government and the franchise is restricted to farmers. *See Ball*, 451 U.S. at 370-71; *Salyer Land Co.*, 410 U.S. at 729; *Associated Enters. v. Toltec Watershed Imp. Dist.*, 410 U.S. 743 (1973).

The challengers contend the right to vote for members of the Commission is just as weighty as their right to vote in other public elections.[4] They maintain the right may not be burdened unless the limitation is necessary to further a compelling state interest, and no compelling interest has been identified here. They claim the district court's ruling runs afoul not only of Supreme Court precedent, but also this court's decision in *Hellebust v. Brownback*, 42 F.3d 1331 (10th Cir. 1994), where this court decided elections for members of a state agriculture board could not be constitutionally restricted to delegates from the agriculture industry.[5]

---

[4] To be clear, the challengers do not take issue with the composition of the nomination commission, only with the restrictions on who is eligible to vote for the commission's lawyer members.

[5] The challengers would have no objection to the nomination process if the Governor had authority to appoint all nine commission members.

**B.**

Before turning to the merits of the challenge, it is necessary to first resolve a dispute over the appropriate level of scrutiny. The challengers argue strict scrutiny is required for any election of "general interest," which would appear to encompass any state or local election not satisfying the *Salyer* and *Ball* criteria. Kansas proposes a more limited inquiry, one constrained by a threshold requirement: the elected office in question must exercise general governmental functions. Under this approach, before determining whether the elective office is of general or limited interest—that is, before deciding whether to apply strict scrutiny under *Reynolds* or rational-basis review under *Salyer* and *Ball*—we must determine whether the office is in fact "governmental," as that term is used by the Supreme Court.

Kansas has identified the correct approach: a threshold inquiry is appropriate. The strict demands of *Reynolds* cannot reasonably apply to every election unable to be wedged into the fact-bound and exceedingly narrow exception established in *Salyer* and *Ball*. Such an inflexible rule would make hash of qualifying language in *Avery* and other decisions restricting *Reynolds* to elective offices exercising "general governmental powers." *Hadley*, 397 U.S. at 53-54; *Avery*, 390 U.S. at 485. It stands to reason from this language, which appears in the Court's decisions as a standalone requirement, independent of the *Salyer*/*Ball* inquiry, *see Hadley*, 397 U.S. at 53-54*, Avery*, 390 U.S. at 485, that one person, one vote has boundaries; some elective offices (apart from the special-purpose districts described in *Salyer* and *Ball*) do not exercise the type of governmental power contemplated in *Reynolds*. Launching into the *Salyer*/*Ball* analysis

- 9 -

without first considering this limitation would render the "general governmental functions" language meaningless—an untenable result, for the phrase is too central to the Court's voting rights jurisprudence to be ignored. *See Bd. of Estimates v. City of New York*, 489 U.S. 688, 693 (1989); *Ball*, 451 U.S. at 362; *Town of Lockport v. Citizens of Cmty. Action*, 430 U.S. 259, 260 (1977); *Concerned Citizens of Southern Ohio v. Pine Creek Conservation Dist.*, 429 U.S. 651, 659 (1977) (Rehnquist, J., dissenting); *Salyer Land Co.*, 410 U.S. at 727; *Associated Enterprises, Inc.*, 410 U.S. at 748; *Hadley*, 397 U.S. at 53-54; *Avery*, 390 U.S. at 485.

What is more, the challengers' contention that *Reynolds* applies to all state and local elections without regard to their subject clashes with the Supreme Court's admonition that one person, one vote should not be applied as a "uniform straitjacket" to restrict states and localities in "devising mechanisms of local government suitable for local needs and efficient in solving local problems." *Avery*, 390 U.S. at 485. Consistent with the time honored regard for states as laboratories for public policy, the Court has acknowledged that the voting-rights decisions must be tempered by the need to permit experimentation with the structure and organization of government. *Ball*, 451 U.S. at 373; *see also Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

But there is scarce room for experimentation in a world where every election, save the exceptional *Salyer/Ball* scenario, is subject to the exacting scrutiny of the federal courts. The need for flexibility is heightened where, as is true of this commission and dozens like it around the country, the challenged election involves a government body serving a structural role in the maintenance of the separation of powers. *See Whalen v.*

*United States*, 445 U.S. 684, 689 n.4 (1980) ("[T]he doctrine of separation of powers embodied in the Federal Constitution is not mandatory on the States."); *Sweezy v. New Hampshire*, 354 U.S. 234, 255 (1957).  The Seventh Circuit recognized as much in rejecting an analogous interpretation of *Reynolds*:

> The plaintiffs believe that whenever a state decides to make an office elective, *all* the principles that the Supreme Court has extrapolated from the First and Fourteenth Amendments to regulate the electoral process are fully applicable.  If this were so, it would be inconsistent with the principle that the federal Constitution does not prescribe any particular separation of powers, or other internal structure, of state government.

*Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1101-02 (7th Cir. 1995).

By the same token, the Third Circuit has distinguished "general public elections" involving offices performing "general governmental functions" from elections involving less influential offices like a university board of trustees which "controls no viable political sub-division and has less power than a local school district."  *See Benner v. Oswald*, 592 F.2d 174, 182-83 (3d Cir. 1979).  Notably, in rejecting a challenge to the trustees' election, the Third Circuit did not mention *Salyer Land Co.* (*Ball* had yet to be decided) or the relaxed scrutiny appropriate for elections involving "functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups," *Salyer Land Co.*, 410 U.S. at 727-28 (internal quotations omitted).  *Benner*, 592 F.2d at 182-83.  Rather, the Court rejected the challenge at the threshold, refusing to equate the right to vote for a university trustee and the right to vote in a participatory democracy.  *Id*. ("[The board of trustees] simply does not possess the minimum governmental powers associated with municipal, school district, county, state,

- 11 -

or federal offices."); *but see Carlson v. Wiggins*, 675 F.3d 1134, 1140 (8th Cir. 2012) (rejecting similar challenge to Iowa's merit selection system on the ground that the state's judicial nomination commission fit *Salyer*'s definition of a special-purpose entity).

In keeping with these decisions, I agree with the Third and Seventh circuits; simply making an office elective does not trigger the strict demands of *Reynolds*. *See Pittman*, 64 F.3d at 1102; *Benner*, 592 F.2d at 182-83. Those demands apply only when the elective office exercises the kind of general governmental functions described in *Avery* and its progeny.

## C.

It follows from these principles, that the Commission does not exercise the type of governmental functions necessary to trigger strict scrutiny. Since this is an appeal from a dismissal under Federal Rule of Civil Procedure 12(b)(6), our review is without deference. *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010). Although the Supreme Court has not provided an exhaustive list of "general governmental functions," the meaning of the term can be gleaned from the circumstances in which it is has been invoked. Without exception, those circumstances involve local governmental bodies whose activities have a direct and immediate effect on voters. In *Avery,* it was a body of commissioners with authority to set tax rates, oversee a budget, and issue bonds, *Avery*, 390 U.S. at 485; in *Kramer* and *Hadley*, education boards which, in addition to administering a school system, had authority to annex new sites and decide matters of local taxation, *Hadley*, 397 U.S. at 53-54; *Kramer*, 395 U.S. at 626. And while the Court's decisions in *City of Phoenix v. Kolodziejski*, 399 U.S. 204, 209 (1970), and

- 12 -

*Cipriano v. City of Houma*, 395 U.S. 701, 705 (1969), involved referenda on municipal bonds rather than elections for public office, the principle informing the rulings was the same: excluding otherwise qualified voters was improper because all voters, not just property owners, were affected by the bond offerings.

The challenge to the Commission has no place in this line of cases. For strict scrutiny to apply, there must be a causal relationship between the elective office and its effect on the electorate. *See Hadley*, 397 U.S. at 53-54. The office must exercise "*general*" government power and must exercise it "*over*" the geographic area served by the body, so that its work has a "sufficient impact" on the electorate. *Id.* The Commission, which can neither make law nor administer it, plainly has no such general power. The Commission is removed from the day-to-day decisions affecting the lives of the electorate. It has no say in matters of safety or welfare—no authority to levy taxes, issue bonds, condemn property, or build roads. Mostly it sits idle, staffless and budgetless, and what limited authority it does have is exercised not "over" a political subdivision, in the way that cities and districts and school boards exercise power over their constituents, but rather in service of its structural role in the judicial appointment process.

Since the powers of the Commission are not of the type typically exercised by a popularly elected body, the challengers gain no traction by appealing to the principle of democratic legitimacy. Limiting the franchise to attorneys will neither "strike at the heart of representative government," *Reynolds*, 377 U.S. at 555, nor deprive qualified voters of their "inalienable right to full and effective participation in the political process," *id.* at

- 13 -

565. Those principles animate the holdings in *Reynolds* and other landmark voting rights decisions, but they do not resonate in this case, because the legitimacy of the Commission's work is not contingent on the popular election of its members. Forged in the ashes of the Kansas triple play, the Commission is designed to ensure the conduct of the executive branch does not threaten the integrity of the judicial branch. Its charter concerns the distribution of power within and among the various organs of government; it is a structural body, not a representative one.

If anything, respect for the democratic process cuts against the challengers' position, which if adopted would frustrate the will of the Kansas people, as embodied in the state constitution. The constitutional amendment creating the Commission has been in place for more than half a century; its vintage a testament to the state's time-honored commitment to judicial independence. *Cf. Van Orden v. Perry*, 545 U.S. 677, 702-03 (2005) (Breyer, J., concurring) (noting the long history of a challenged religious display as one factor in favor of its constitutional legitimacy).

The challengers maintain the Commission's governmental function lies in the role it plays in the appointment process. According to them, appointing judges is a core executive duty in which the Commission plays an indispensable role. Not only does this view misconceive the purpose of the Commission, but it conflates the Commission's authority with that of the governor. Although the appointment power does traditionally fall to the executive, it is the governor, not the Commission, who performs it in Kansas. The Commission, in interviewing candidates and recommending suitable nominees, performs a carefully circumscribed intermediate role. *That* role—winnowing a candidate

- 14 -

pool to cabin the governor's discretion and ensure he chooses from only qualified nominees—is not a traditional government function, but rather a structural innovation of the merit-selection system. If anything the role is *anti-governmental*, in that it is carved from the governor's previously unlimited authority to make judicial appointments and vested in an independent commission of citizens.[6]

The Eighth Circuit reached a similar conclusion in rejecting an equal-protection challenge to Iowa's merit selection system. *See Carlson*, 675 F.3d at 1136, 1141. "[T]he sole function of the Commission," the court explained, "is to screen the applications it receives and select from these applications the three most qualified candidates to forward to the Governor for judicial appointments." *Id*. at 1141. Since Iowa's governor retains the ultimate power to make judicial appointments, the court rejected the challengers' "attempt to equate the powers of the Commission with the powers of the Governor." *Id*. at 1140.

Finally, the challengers say our decision in *Hellebust* compels reversal of the district court's decision. In *Hellebust*, this court struck down a statute providing for the election of the Kansas Board of Agriculture by a select group of delegates from the agriculture industry on the ground that it violated the one person, one vote rule. 42 F.3d

---

[6] Appellants seem to have no quarrel with the Governor's power to appoint some Commission members (non-lawyers) and, presumably, all members. But, as history teaches, the Commission was established to constrain gubernatorial power and influence. Whether that goal is best accomplished by empowering lawyers with diverse political interests, but strong institutional loyalty to the third branch of government and intimate knowledge of the courts and would-be judges, should best be left for the people to decide, as they have.

at 1332, 1134-35. The challengers contend the facts in *Hellebust* are materially indistinguishable: in both cases, they observe, the state held elections for public office while depriving certain qualified voters of the right to vote on equal terms with others.

The challengers overlook a crucial distinction between this case and *Hellebust*. The issue here—whether the elective office meets the "general government functions" threshold—was taken for granted in *Hellebust*, where the analysis focused not on whether the agriculture board is governmental (it plainly was), but whether the authority it exercised was sufficiently narrow in reach and disproportionate in effect to satisfy the *Salyer/Ball* exception. *Hellebust*, 42 F.3d at 1334. Since the Commission does not exercise the type of governmental power contemplated in *Reynolds*, there is no reason to address the application of the *Salyer/Ball* exception, and thus no occasion to consider the applicability of *Hellebust*.

In the end, this court must defer to Kansas in decisions relating to the structure of its government. *See Gregory,* 501 U.S. at 460 ("Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign."). Kansas voters adopted merit selection as a middle ground between an appointment process scarred by abuse and an elective process susceptible to politicization. By giving lawyers a controlling vote on the Commission, Kansas could cabin the governor's appointment power while still protecting the judiciary from the corrosive force of popular politics. The structural role of the Commission, considered in combination with its decidedly non-governmental functions, takes it out of the heartland of the voting rights cases, making it unnecessary to consider whether members are

- 16 -

elected in accordance with *Reynolds*. And since no fundamental right is at stake, the deference to democratic process that informs rational-basis review requires upholding the challenged law if we can imagine a conceivable justification for it. *See Vance v. Bradley*, 440 U.S. 93, 97 (1979); *Ball*, 451 U.S. at 371. I would have no difficulty doing that here.

Kansas designed the Commission to favor lawyers in order to limit the influence of politics on the nomination process and ensure the quality of its judicial nominees. Preserving the quality and independence of the judiciary is a legitimate government interest, and having attorneys elect a majority of the Commission's members is a rational way to accomplish that goal. Attorneys are better equipped than non-attorneys to evaluate the temperament and legal acumen of judicial candidates and more likely to base their votes on factors other than party affiliation. This is owing in part to their training, which enables informed judgments about a candidate's experience—his credentials, his area of expertise, his body of work—and the extent to which it strengthens or weakens his candidacy. Another part is propinquity—typical of many tightly knit legal communities like the Kansas bar, attorney members of the Commission will often be personally familiar with a candidate, whether by virtue of having worked with her (or appeared before her), or else because they know someone who has.

For the foregoing reasons, the equal protection challenge to the election of the Commission's attorney members fails.

I concur in the Order and Judgment.

- 17 -

10-3320, *Dool, et al. v. Burke, et al.*

**MATHESON**, J., concurring.


I would affirm on the same grounds as *Carlson v. Wiggins*, 675 F.3d 1134 (8th Cir. 2012), which rejected a similar challenge to Iowa's merit judicial selection system. The Eighth Circuit determined that Iowa's limitation on voting for attorney members of its nominating commission to Iowa lawyers was entitled to rational basis review because the commission performs a limited purpose, affects attorneys more than others, and therefore meets the Supreme Court's *Salyer/Ball* standard. *See id.* at 1140-42; *see also Ball v. James*, 451 U.S. 355, 370–71 (1981); *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 728 (1973).

Judge O'Brien's concurring opinion concludes that the election of attorney members to the Kansas Supreme Court Nominating Commission ("Commission") does not fit in the line of strict scrutiny cases that flow from *Kramer v. Union Free School District No. 15*, 395 U.S. 621 (1969). It also maintains that the franchise restriction does not fit comfortably within the *Salyer/Ball* exception to *Kramer*. It concludes that, because the Commission does not perform general government functions, the restriction on who may vote for attorney members of the Commission should not require strict scrutiny.

I agree that strict scrutiny should not apply, but I would rely on *Salyer/Ball* to reach this conclusion. In *Hellebust v. Brownback*, 42 F.3d 1331 (10th Cir. 1994), we stayed within the Supreme Court's *Kramer/Salyer* framework to affirm a successful equal

protection challenge to a franchise restriction on the election of members to the Kansas State Board of Agriculture. Limiting the vote to delegates of Kansas agricultural organizations who attend the Board's annual meeting fell outside the *Salyer/Ball* exception because the Board exercised "normal functions of state government." *Id*. at 1335. The Board also did not have a disproportionate effect on the voting delegates. *Id.*

As in *Hellebust*, we can employ the *Salyer/Ball* standard here to determine whether rational basis scrutiny applies to restricting the voting franchise for the Commission's attorney members to licensed Kansas attorneys. We need only decide whether the Commission performs a limited purpose and whether it has a disproportionate effect on the voting population of attorneys. It does both.

The Commission performs a limited role. It reviews applications for judicial vacancies and proposes a slate of three candidates from which the Governor appoints one to an open position. The Commission does not make, administer, or enforce laws. It has no taxing or borrowing authority. *See Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 53 (1970); *Ball*, 451 U.S. at 366 (noting that the water and power district at issue could not mandate ad valorem taxes, enact laws, or "administer such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services").

To meet the *Salyer/Ball* standard, it is not necessary that the Commission perform no government tasks. The water districts at issue in *Ball* and *Salyer* exercised some government functions. For example, both of the districts could issue bonds and condemn property using eminent domain. *See Ball*, 451 U.S. at 360; *Salyer*, 410 U.S. at 730 n.7.

However, the districts' powers were limited. The Commission's power is arguably even more limited. It performs one step in a judicial appointment process—screening applicants and selecting three nominees—that concludes when the Governor appoints.

The Commission also disproportionately affects attorneys. Only licensed Kansas attorneys may be nominated to serve as judges on a Kansas appellate court. *See* Kan. Stat. Ann. § 20-105 (Supreme Court); *id.* at § 20-3002(a) (Court of Appeals). The Commission's task is to nominate attorneys to serve on the bench. Because only attorneys may apply, the screening process affects attorneys more than it affects others.

The Commission's selection of judicial nominees may to some degree affect the makeup of the Kansas judiciary and, therefore, affect the public at large. But the question is not whether those seeking the vote are affected to some degree, but "whether the effect of the entity's operations on [the voting group is] disproportionately greater than the effect on those seeking the vote." *Ball*, 451 U.S. at 371. The voting group need not be "the only parties at all affected." *Id.* Our focus is on the Commission's effect, not the effect of the judiciary as a whole. The Commission's role in choosing from the Kansas legal community the three most qualified applicants for a judicial vacancy has a disproportionate impact on the bar relative to the general population.

Whether the Commission serves a narrow, limited purpose and whether, as Judge O'Brien's concurrence suggests, it does not exercise a general government function may be two sides of the same coin. But keeping a tie to the *Kramer/Salyer* framework is consistent with *Hellebust* and Supreme Court precedent.

Accordingly, I conclude that because the Commission serves a limited purpose—

arguably more limited than the water districts in *Salyer* and *Ball*—and because it affects attorneys more than others, the franchise limitation on voting for attorney members of the Commission to Kansas lawyers must bear only a rational relationship to the objectives of the merit selection process. For many of the reasons stated in Judge O'Brien's concurring opinion, that standard is easily met here.

Finally, one court has questioned whether the selection of attorney members for a nominating commission even qualifies as a popular election as contemplated by the *Kramer/Salyer* precedent because the entire process is essentially appointive rather than elective. *See Bradley v. Work*, 916 F. Supp. 1446, 1456 (S.D. Ind. 1996) (explaining that a commission nomination system did not constitute a popular election but was closer to an executive appointment). Under this view, regardless of whether the Kansas Bar Association's Board of Governors were to appoint the attorney members—as the Board of Governors does in Alaska, *see Kirk v. Carpenti*, 623 F.3d 889, 890 (9th Cir. 2010)—or whether members of the Kansas Bar choose them by voting, the attorney members join with four others appointed by the Governor to become part of an executive branch appointment process. That seems to be a far cry from the school board election in *Kramer* or even the water district election in *Salyer*. Nonetheless, as this case can be resolved because the Commission serves a limited purpose and affects attorneys more than others, I would affirm under *Salyer/Ball*.

10-3320, *Dool v. Burke*

**McKAY**, dissenting.

The end objective of the process at issue is the selection of judges whose impact is fundamentally general. The impact of this process on the employment of lawyers is of little consequence when measured against its impact on litigants and the rules governing social behavior.

In *Salyer* and *Ball*, the end impact was on discrete groups. That is, the election in those cases directly determined the governing officers for a water district that "disproportionately affect[ed] landowners." *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 729 (1973). The general public was only nominally impacted. Moreover, "the provision of [utilities] is not a traditional element of governmental sovereignty, and so is not in itself the sort of general or important governmental function that would make the government provider subject to the doctrine of the *Reynolds* case." *Ball v. James*, 451 U.S. 355, 368 (1981) (citation omitted). "[T]he relationship between [residents] and the District's power operations is essentially that between consumers and a business enterprise from which they buy." *Id.* at 370.

Here, by contrast, the election at issue is for a majority of the members of the nominating commission which limits the governor as judicial-appointing authority to one of three candidates. The selection of judicial candidates is quintessentially governmental in nature, and a judicial nominating commission "bears no resemblance at all to the nominally public business enterprises at issue in *Ball*." Nelson Lund, *May Lawyers Be Given the Power To Elect Those who Choose Our Judges? "Merit Selection" and*

*Constitutional Law*, 34 Harv. J.L. & Pub. Pol'y 1043, 1053 (2011). "This nominating power has to be regarded as a governmental function, and subjected to strict scrutiny, for the same reason that the Supreme Court applies strict scrutiny to primary elections conducted by political parties and elections to the electoral college." *Id.* at 1053-54 (footnote omitted). The fact that only lawyers may serve on the bench adds little to the weighing process, given the strong public interest in the selection of state court judges.

The election at issue, like a primary election, is one step in the process of determining who will exercise one of the three most critical governmental functions: here, the judicial function. This election is not shielded from constitutional challenge simply because its role in this process is indirect: "Presidential elections, for example, are subject to scrutiny under *Reynolds*, notwithstanding the intermediating role of the electoral college." *Id.* at 1049.

Nor does the governor's final say in the appointment process insulate the nominating commission election from constitutional concerns. The nominating commission does not simply screen and recommend candidates in an advisory fashion—it presents three possible candidates to the governor, one of whom he must select even if he finds all three unacceptable. This process is subject to manipulation, as the commission can effectively choose its own candidate by nominating only one acceptable choice along with two individuals it knows the governor will not select. *See id.* at 1050. "By delegating to the state's lawyers the authority to elect a controlling majority of a body that exercises almost all of the discretion involved in appointing supreme court justices,

Kansas has virtually given the state bar the authority to elect those who choose the justices. The State's choice of a complex procedure that obscures that effect cannot alter the reality of the effect." *Id.* at 1055. Moreover, there is not even the saving grace of confirmation of the appointment choice by the legislature (a representative elected body).

I would find the election unconstitutional under the Supreme Court's equal protection jurisprudence.